# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

CARL DARRELL HARRIS, a minor )
child, by CAROLYN HARRIS as "next )
friend" and mother, and CAROLYN )
HARRIS individually, )
                               )
        Plaintiffs, )             **Case No. 3:06-0868**
                               )             **Judge Trauger**
v. )
                               )
THE METROPOLITAN )
GOVERNMENT OF NASHVILLE, )
DAVIDSON COUNTY, NASHVILLE )
POLICE OFFICER MATTHEW )
VALIQUETTE, NASHVILLE POLICE )
OFFICER CHRISTOPHER HENDRY, )
and NASHVILLE POLICE )
LIEUTENANT LEANDER DUPIE, )
                               )
        Defendants. )

## <u>MEMORANDUM</u>

This case comes before the court on Motions for Summary Judgment filed by defendant

Officer Christopher Hendry (Docket No. 19), and by defendants Metropolitan Government of

Nashville, Davidson County ("Metropolitan Government"), Lt. Leander Dupie and Officer

Matthew Valiquette (Docket No. 22), to which the plaintiffs have responded (Docket No. 27),

and defendants Metropolitan Government, Lt. Leander Dupie, and Officer Matthew Valiquette

have replied, (Docket No. 32). For the reasons discussed herein, defendant Officer Christopher

Hendry's motion will be granted in part and denied in part, and defendants Metropolitan

Government's, Lt. Leander Dupie's and Officer Matthew Valiquette's motion will be granted in

part and denied in part.

1

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

At approximately noon on August 3, 2005, plaintiff Carl Darrel Harris, a juvenile[1]
weighing, at the time, 90 pounds, and measuring five feet and three inches tall, was pinned to the
ground and arrested in a joint effort by Officers Matthew Valiquette, Christopher Hendry, and
Lt. Leander Duprie, on suspicion that he was gambling.[2] Mr. Harris was, at the time, sitting on a
friend's porch in the Haynes Garden Apartments, located at 2715 Whites Creek Pike, along with
another juvenile and an adult. The Metropolitan Police Department had, a few minutes earlier,
received a call alerting the Department that a group of individuals were gambling in that area.
The caller had described the suspected gamblers as African-American males, wearing white t-
shirts.

After questioning another group of individuals in the parking lot of the Haynes Garden
Apartments, apparently from their patrol car, the officers parked their car in front of a
breezeway, where they observed the plaintiff and his two companions who fit the description of
white t-shirt wearing African-American males. Officer Valiquette told the two youths and their
accompanying adult that he was looking for gamblers and asked that they come down from the
porch to speak with him.

Ronald Howse, the adult who was sitting with the two youths (who happened also to be

_____

[1]Mr. Harris was born on May 18, 1990 and was, therefore, sixteen at the time of the
incident.  (Docket No. 22, Ex. 3, Harris Dep. at p. 5)

[2]Unless otherwise noted, the facts have been drawn from the plaintiffs' Complaint
(Docket No. 1, Ex. 2, "Complaint"), the plaintiff's Response to the Defendants' Motions for
Summary Judgment (Docket No. 27), the plaintiff's Response to Defendant Metropolitan
Government's, Officer Valiquette's, and Lieutenant Dupies' Statement of Material Facts (Docket
No. 28), and the plaintiff's Response to Defendant Officer Hendry's Statement of Material Facts
(Docket No. 29).

2

the father of Mr. Harris's younger companion), asked Officer Valiquette why they had to come down off the porch. Officer Valiquette appears not to have responded directly to this question, but instead replied, "bring your black ass down here, too." Eventually all three individuals descended the stairs towards Officer Valiquette, in compliance with his directives.

As Mr. Harris descended the stairs and made his way towards Officer Valiquette, he told the officer that his right arm, which bore a large white patch delivering pain medication, had recently been injured playing basketball. Officer Valiquette alleges that, as Mr. Harris approached him, it appeared to Officer Valiquette that Mr. Harris planned to just walk right past him. It is not clear how Officer Valiquette made this determination. In any case, Officer Valiquette grabbed Mr. Harris's right arm. In reaction to this touch, Mr. Harris's injured arm "tightened up". Apparently believing that an arm that "tightens up" when grabbed has committed an act of physical resistance (Docket No. 25 at ¶ 4), Officer Valiquette told Mr. Harris to stop resisting. Hearing no response, Officer Valiquette decided to "gain control" over Mr. Harris by pushing his face against a concrete wall. This action appears not to have caused Mr. Harris's right arm to loosen, for Officer Valiquette instructed him, a second time, to stop resisting. Officer Valiquette searched Mr. Harris.

Mr. Harris responded, "Why did you do that?" In response, Officer Valiquette instructed Mr. Harris, a third time, to stop resisting and also to put his hands behind his back. Before Mr. Harris was able to comply with this request, he was "assisted to the ground" via a leg sweep performed by Officer Hendry. Officer Valiquette, for the fourth time, told Mr. Harris to stop resisting, shortly after jumping on top of Mr. Harris and pushing his knee into Mr. Harris's back. With his knee on Mr. Harris's back, Officer Valiquette attempted to gain control over Mr.

3

Harris's injured right arm, which was on the ground, underneath Mr. Harris's chest.

At this time, Officer Valiquette yelled "tase him!" Lt. Dupie, who was standing nearby, attempted to deploy his taser, but as Lt. Dupie removed it from its holster, the taser cartridge became hung on his belt. Somehow this caused the cartridge to fall to the ground and break. Accordingly, Lt. Dupie was unable to tase Mr. Harris. Instead, he placed his foot on Mr. Harris's face.

While Lt. Dupie placed his foot on Mr. Harris's face and Officer Hendry held Mr. Harris's legs, Officer Valiquette managed to handcuff Mr. Harris. Next, Officer Valiquette escorted Mr. Harris to the patrol car, and placed him in the back seat. Mr. Harris alleges that, during this time, he told Officers Valiquette and Hendry that his uncle was a police officer and that, after he made this statement, Officer Valiquette decided to issue a citation against him in lieu of taking him to the station. Eventually Mr. Harris was taken out of the patrol car. The officers remained on the scene with Mr. Harris for approximately ten more minutes, during which time Mr. Harris's mother, Carolyn Harris, appeared on the scene and took custody of him. Officer Valiquette issued Mr. Harris a citation for resisting a stop. This charge was later dismissed in juvenile court.

The next day, Mr. Harris and his mother went to Vanderbilt Hospital for medical care. The medical staff told Mr. Harris that he had suffered a "strained muscle" and that he should wrap his arm in a heating pad with an Ace bandage. Dr. Jeffrey McKinzie diagnosed Mr. Harris with a soft tissue injury to his left arm[3].

_____

[3]Dr. McKinzie's Emergency Department Note reports that Mr. Harris "complained of pain in the left arm" and that this was the arm that was injured playing basketball and subsequently twisted by the defendant police officers. (Docket No. 22, Ex. 4) However, Mr.

On August 3, 2006, plaintiffs Carl Harris and Carolyn Harris filed this action in the Circuit Court for Davidson County, Tennessee, alleging: (1) use of excessive force in violation of the Fourth Amendment and 42 U.S.C. § 1983 against Officers Valiquette and Hendry, and Lt. Dupie, (2) false and malicious arrest in violation of the Fourth, Fifth, and Fourteenth Amendments and § 1983 against the Metropolitan Government, (3) failure to train the officers to refrain from excessive force in violation of the Fourth Amendment and § 1983 against the Metropolitan Government, (4) a custom, practice, or policy of unconstitutional seizures, in violation of the Fourth Amendment and § 1983, against the Metropolitan Police Department, (5) negligence in effectuating an arrest, in violation of the Tennessee Government Tort Liability Act ("TGTLA"), against the Metropolitan Government, (6) a claim for assault and battery under Tennessee law against Officers Valiquette and Hendry, and Lt. Dupie, (7) a claim for outrageous conduct under Tennessee law against Officers Valiquette and Hendry, and Lt. Dupie and (8) a claim for false arrest and malicious prosecution under Tennessee law against Officers Valiquette and Hendry, and Lt. Dupie. (Docket No. 1, Ex. 2, "Complaint")

On September 7, 2006, the defendant filed a notice of removal in this court, pursuant to 28 U.S.C. § 1441. (Docket No. 1) On October 10, 2006, defendants Lt. Dupie, Metropolitan Government, and Matthew Valiquette moved to dismiss Counts One through Four of the Complaint as brought by Ms. Harris, and to dismiss all claims under § 1983 for punitive damages against the Metropolitan Government. (Docket No. 6) On November 20, 2006, the

_____

Harris testified in his deposition that it was his right arm that was injured playing basketball and further injured by the officers. (Docket No. 22, Ex. 3, Harris Dep. at p. 17), and Officer Valiquette also testified that he first grabbed Mr. Harris's right arm. (Docket No. 22, Ex. 1, Valiquette Dep. at p. 20) No party has attempted to explain this discrepancy.

5

court granted the motion for partial dismissal, dismissing the claims asserted by Ms. Harris under § 1983 and the claim for punitive damages under § 1983 against Metropolitan Government. (Docket No. 12)

On October 16, 2007, defendant Officer Hendry moved for summary judgment (Docket No. 19), and on the same date, defendants Metropolitan Government, Lt. Leander Dupie and Officer Matthew Valiquette also moved for summary judgment. (Docket No. 22)

## ANALYSIS

### I.      Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). Our function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

6

If the nonmoving party fails to make a sufficient showing on an essential element of the case—provided that the nonmoving party bears the burden for that element—the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). And we must keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. Finally, "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to an analysis of the plaintiffs' claims.

## II.    The Officers' Qualified Immunity Defense

Officers Valiquette and Hendry, and Lt. Dupie have each raised the defense of qualified immunity as to the plaintiffs' claim for excessive force under the Fourth Amendment and 42 U.S.C. § 1983. Government officials performing discretionary functions pursuant to their employment "are shielded from liability through 'qualified immunity' if they violate an individual's constitutional rights," but the rights were not "'clearly established' at the time" they

7

were violated.  *Marvin v. Taylor*, ---F.3d ----, 2007 WL 4232968 at *7 (6th Cir. Dec. 4, 2007)

(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The defense "shields government

officials from 'liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.'"

*Humphry v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007) (quoting *Harlow*, 457 U.S. at 818); *see

also Smoak v. Hall*, 460 U.S. F.3d 768, 777 (6th Cir. 2006).

       That is, "'[q]ualified immunity is *an immunity from suit* rather than a mere defense to

liability; and like an absolute immunity it is effectively lost if a case is erroneously permitted to

go to trial.'" *Marvin*, 2007 WL 4232968 at *7 (emphasis in original) (quoting *Scott v. Harris*, ---

U.S. ----, ----, 127 S.Ct. 1769, 1774 n. 2 (2007)); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526

(1985).  Therefore, qualified immunity operates to defeat a plaintiff's constitutional claim

against a police officer who made "a decision that, even if constitutionally deficient, reasonably

misapprehend[ed] the law governing the circumstances."  *Id*. (quoting *Brosseau v. Haugen*, 543

U.S. 194, 198 (2004)); *see also Saucier v. Katz*, 533 U.S. 194, 206 (2001) ("Qualified immunity

operates . . . to protect officers from the sometimes 'hazy border between excessive and

acceptable force.'")

       In order to effectuate qualified immunity as an "immunity from suit" rather than a

defense to liability, the Supreme Court has promulgated a two-part inquiry for analyzing this

issue: "the first inquiry must be whether a constitutional right would have been violated on the

facts alleged; second, assuming the violation is established," the court must address "whether the

right was *clearly* established . . . on a . . . specific level."  *Saucier*, 533 U.S. 194, 200 (2001)

(emphasis added).  The Sixth Circuit has recently reiterated that "[t]he issue of qualified

immunity may be submitted to a jury only if 'the legal question of immunity is completely dependent upon which view of the [disputed] facts is accepted by the jury.'" *Humphry*, 482 F.3d at 846 (quoting *Brandenburg v. Cureton*, 882 F.2d 211, 216 (6th Cir. 1989)).[4]

## A.    Whether The Allegations Establish A Constitutional Violation

The threshold question requires the court to consider, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id*. Of course, if the allegations support "no constitutional violation, then the plaintiff's § 1983 claim fails as a matter of law and the defendant is therefore entitled to

---

[4]This should be a rare situation. The Supreme Court has directed that the first inquiry should be analyzed on the facts alleged by the plaintiff and the second inquiry—whether a given right is clearly established—is primarily a question of law, under an objective reasonableness standard. *Saucier*, 533 U.S. at 200-02; *Forsyth*, 472 U.S. at 526 (Qualified immunity "recognize[s] an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the *essentially legal question* whether the conduct of which *the plaintiff complains* violated clearly established law.") (emphasis added). Put another way, determining qualified immunity issues at the pre-trial stage, rather than submitting such questions to the jury, is required by the conception of this immunity as an "immunity from suit." *See Forsyth*, 472 U.S. at 526 ("The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.") If issues involving qualified immunity were commonly submitted to juries, it could not be said to function as an "immunity from suit." Instead, submitting such questions to the jury concurrently with the question of liability—which itself often requires determinations of "reasonableness"—seems most likely to serve as a cause for confusion. In light of the fact that the purpose of qualified immunity is to protect government officers *from suit*, it is difficult to determine what other purpose submitting such questions would serve. *See Donta v. Hooper*, 774 F.2d 716, 719 (6th Cir. 1985) ("[I]t was improper for the district court to give the jury the issue of the defendants' objective good faith . . . . [T]his is purely a legal question to be determined by the trial judge prior to trial.") Fortunately, the question of immunity is quite far from "completely dependent" on which view of the facts is accepted by the jury in the case at hand—under the Supreme Court's *Saucier* test, qualified immunity simply does not avail—and so the court need not delve into the intricacies of this issue.

summary judgment and does not need qualified immunity." *Marvin*, 2007 WL 4232968 at *8 (citing *Scott*, 127 S.Ct. at 1779).

The facts alleged by the plaintiff do, indeed, establish a violation of his Fourth Amendment right to be free from excessive force on the part of each of the police officers. Claims for "excessive force in the course of making an arrest . . . are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989); *see also Scott*, 127 S.Ct. at 1776; *Marvin*, 2007 WL 4232968 at *8. In *Scott*, the Court affirmed that the question is "whether [the police officer's] actions were objectively reasonable." *Scott*, 127 S.Ct. at 1776; *see also id.* at 1776 n. 8 ("[T]he reasonableness of [the officer's] actions . . . is a pure question of law.").

In "determining the reasonableness of the manner in which a seizure is effected, the court must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Marvin*, 2007 WL 4232968 at *9 (internal citations omitted). This balance "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case;" *Burchett v .Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396); and the balance "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *Burchett*, 310 F.3d at 944; *Marvin*, 2007 WL 4232968 at *9.

The facts and circumstances, as depicted by the plaintiff's allegations, provide scant basis

10

for the officers' use of force in this case. According to the plaintiff, he did not plan to walk past Officer Valiquette, but instead was walking towards him—and in fact, warning the officer about the condition of his arm—when force was first applied to him. Although the present inquiry does not require the court to consider discrepancies between the plaintiff's and the defendants' factual assertions, it is difficult to understand how Officer Valiquette could have determined that the plaintiff was planning to walk past him, and somehow escape what was, at that point, an investigatory stop, at the very moment that the plaintiff was walking directly towards him. The plaintiff, an unarmed minor, weighing 90 pounds and measuring five feet, three inches tall, posed absolutely no safety threat to the officers or anyone else present. And, notwithstanding Officer Valiquette's repeated instructions to the plaintiff to "stop resisting," the evidence presented by the plaintiff indicates that he did not resist Officer Valiquette and, in fact, did not have the ability to resist him. The "tensing" of an injured arm does not amount to resistance. Finally, gambling itself is not a violent crime, nor one that poses direct health risks to those who engage in it and, aside from the anonymous phone call alleging that African-American males in t-shirts were gambling in the area, there was no actual evidence that the plaintiff was gambling.

In short, no mitigating factor applies to the officers' conduct, and that conduct, in the case of each individual officer, was not objectively reasonable. Officer Valiquette grabbed the plaintiff's arm moments after the plaintiff informed him that the arm was injured, pushed the plaintiff's face against a concrete wall and, once the plaintiff was brought to the ground via a leg sweep from Officer Hendry, pushed his knee into the plaintiff's back.

Officer Hendry participated by sweeping the plaintiff's legs out from under him and then holding those legs while Officer Valiquette handcuffed the plaintiff. These actions, under the

11

circumstances, were also objectively unreasonable. Finally, although Lt. Dupie was unable to utilize his taser, the action that he took instead—placing his foot on the plaintiff's face—was also objectively unreasonable. Accordingly, the allegations establish a constitutional violation against each of the officers.

### B.     Whether The Constitutional Violation Was Clearly Established

Next the court must determine whether these violations were clearly established. In *Saucier*, the Supreme Court explained that "[t]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. It is not enough to state the general proposition that the Fourth Amendment protects against uses of force that are excessive under objective standards; rather, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In performing this analysis, the court "must look first to decisions of the Supreme Court, then to the decisions of [the Sixth Circuit Court of Appeals] . . . and finally to decisions of other circuits." *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002). That a violation was clearly established "can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (citing *Hope v. Pelzer*, U.S. 730 (2002)).

It is not difficult to find authority showing that the particular violations at issue in this case were clearly established at the time of the incident. In the Sixth Circuit, "the law is clearly

established that an officer may not use additional gratuitous force once a suspect has been neutralized." *Alkhateeb v. Charter Township of Waterford*, 190 Fed. Appx. 443, 452 (6th Cir. 2006); *see also Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) (finding "no governmental interest in continuing to beat [the plaintiff] after he had been neutralized, [and] nor could a reasonable officer have thought there was"); *Bass v. Robinson*, 167 F.3d 1041, 1044 (holding that the plaintiff's allegations that, despite his compliance, "Officer Robinson attacked him both verbally and physically, . . . put him in a 'headlock' and slammed his head against a tree several times" were sufficient to defeat summary judgment); *McDowell v. Rogers*, 863 F.2d 1202 (6th Cir. 1988) (holding that hitting a handcuffed suspect with a nightstick when the suspect was not resisting arrest was gratuitous and unreasonable).

In the case at hand, under the plaintiffs' allegations, Mr. Harris did not resist arrest at all. Accordingly, there was never an excuse for the officers' use of gratuitous force. That this gratuitous force continued even after Mr. Harris had been pushed into a wall and after he had been "assisted" to the ground, to the point that one officer pushed his knee into Mr. Harris's back while another held his legs and the third put his foot on Mr. Harris's face quite clearly establishes a violation of long standing Sixth Circuit precedent. Any reasonable police officer would have understood that he was violating Mr. Harris's rights when acting as the defendant officers acted. Accordingly, they are not entitled to qualified immunity against the plaintiffs' excessive force claim.

## III. The Plaintiff's *Monell* Claims

The plaintiffs have alleged causes of action against Metropolitan Government under § 1983 for false and malicious arrest, failure to train the officers to refrain from excessive force,

and for maintaining a custom, practice, or policy of unconstitutional seizures.  It is "firmly established that a municipality . . . cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents."  *Gregory v. Shelby County, Tennessee*, 220 F.3d 433, 441 (6th Cir. 2000) (citing *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978)).  Accordingly, "[f]or liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort."  *Id.*  This requirement ensures that a municipality "is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be" imputed to the municipality.  *Id.*  In addition, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decision[-]maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law;" *Board of County Com'rs of Bryan County, Okl., v. Brown*, 520 U.S. 397, 404 (1997); however, "[a] custom . . . must be so permanent and well settled as to constitute a custom or usage with the force of law."  *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 507-08 (6th Cir. 1996).

To prevail on a custom, practice, or policy claim, the plaintiffs "must demonstrate that 'through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  *Gregory*, 220 F.3d at 442 (quoting *Board of County Comm'rs*, 520 U.S. at 405).  That is, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."

If liability is premised on failure to supervise, "a supervisory official's failure to supervise is not actionable unless the supervisor either encouraged the specific incident of

14

misconduct or in some other way directly participated in it." *Ontha v. Rutherford County, Tennessee*, 222 Fed. Appx. 498, 504 (6th Cir. 2007) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999), *cert. denied*, 530 U.S. 1264 (2000)). Accordingly, "[a]t a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.*

To establish liability for failure to train, "it is not enough to point after the fact to a particular sort of training which, if provided, might have prevented the harm suffered in a given case." *Ontha*, 222 Fed. Appx. at 504 (6th Cir. 2007). Rather, "such liability attaches only if a constitutional violation is 'part of a pattern' of misconduct or 'where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to occur." *Id.* (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982), *cert. denied*, 459 U.S. 833 (1982).

The plaintiffs have not supported their claims against Metropolitan Government with any factual allegations. They have not identified any specific custom, formally adopted or otherwise, covering the violations at issue in this case. They have not identified any municipal action that could have caused the deprivations committed by the officers, nor any official who implicitly authorized, approved, or knowingly acquiesced in the officers' actions. Neither have the plaintiffs proffered any facts in support of liability for failure to train. They have identified no pattern of misconduct or any specific training that could be characterized as reckless or grossly negligent. Because the plaintiffs have not supported their *Monell* claims with any specific facts or allegations, the court will grant the defendant summary judgment as to those claims.

15

## IV.    The Plaintiffs' Tennessee Law Claims

In addition to his § 1983 claims, the plaintiffs have asserted several claims against the defendants under Tennessee statutory and common law.  The court exercises supplemental jurisdiction over those claims under 28 U.S.C. § 1367(a).

### A.    Supplemental Jurisdiction Over the Negligence Claim

Defendant Metropolitan Government urges the court to decline to exercise supplemental jurisdiction over the plaintiff's negligence claim.  District courts may decline to exercise supplemental jurisdiction over a claim "if . . . in exceptional circumstances, there are other compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(c).  The compelling reason for declining jurisdiction in the case at hand is the Tennessee Governmental Tort Liability Act ("TGTLA"), which applies to the negligence claim against Metropolitan Government[5] and provides that "[t]he circuit courts shall have exclusive original jurisdiction over any action brought under this chapter."  T.C.A. § 29-20-307.

This court has held that § 29-20-307 provides a basis for denying supplemental jurisdiction over state law claims in similar cases, *see, e.g., Beddingfield v. City of Pulaski, Tennessee*, 666 F. Supp. 1064, 1067 (M.D. Tenn. 1987) ("[A]s a matter of judicial power pendent jurisdiction probably cannot stand in the face of the limitations upon suability specified

---

[5]The TGTLA provides that government entities shall not be immune from suit "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment."  T.C.A. § 29-20-205.  The TGTLA "addresses the liability of governmental entities only," and, therefore, does not apply to individually named municipal employees. *Timberlake v. Benton*, 786 F. Supp. 676, 697 (M.D. Tenn. 1992) (holding that the TGTLA's jurisdictional limitations "do not apply to persons sued individually").  However, the plaintiff has named only Metropolitan Government as a defendant to his negligence claim.  Therefore, the TGTLA's jurisdictional restriction applies to the court's exercise of jurisdiction over that claim as a whole.

16

in . . . § 29-20-307."); *Spurlock v. Whitley*, 971 F. Supp. 1166, 1185 (M.D. Tenn. 1997) ("[T]he exclusivity provision of the TGTLA provides a compelling reason for this Court to decline supplemental jurisdiction of the TGTLA claim in this case"), and the Sixth Circuit has held that it was not error for a district court to do so. *See Gregory*, 220 F.3d at 446 ("[T]he Tennessee legislature expressed a clear preference that TGTLA claims be handled by its own state courts."). The TGTLA's exclusivity provision is an exceptional circumstance, providing ample reason for the court to decline supplemental jurisdiction over the negligence claim[6]. *Spurlock*, 971 F. Supp. at 1185; *see also Timberlake*, 786 F. Supp. at 696 (finding that the TGTLA "appears to place exclusive original jurisdiction for claims arising under it with the state courts"). Accordingly, the court will dismiss the plaintiff's negligence claim.

**B**.      **Qualified Immunity under *Youngblood***

Tennessee authority indicates that qualified or good faith immunity also applies to municipal officers who have been named as defendants in state causes of action. *See Youngblood v. Clepper*, 856 S.W.2d 405, 406 (Tenn. Ct. App. 1993) (applying a "common law immunity" to state law claims raised against police officers); *see also Rogers v. Gooding*, 84 Fed. Appx. 473, 477 (6th Cir. 2003) (holding that "the district court properly applied the qualified immunity defense" to the state law claims). Accordingly, the court will analyze the defendants' qualified immunity defenses with respect to each of the plaintiffs' remaining state law causes of action, first determining whether any such cause of action survives summary judgment and, second, whether the specific right at issue was "clearly established" at the time of the incident. *Rogers*, 84 Fed. Appx. at 477; *Willis v. Neal*, No. 06-5695, Slip Copy, 2007 WL 2616918 at *6

---

[6]The fact that the TGTLA mandates a bench trial on that claim provides an additional, practical reason to separate it from the other claims in this case, which will be tried to a jury.

17

(6th Cir. Sep. 7, 2007) ("Tennessee law provides qualified or good faith immunity of government employees for state law torts.").

### 1. Assault and Battery

Under Tennessee law, a cause of action for assault and battery can be proven where an officer has caused damage by an excessive and unprovoked use of force. *City of Mason v. Banks*, 581 S.W.2d 621, 626 (Tenn. 1979) (holding that the officer "was liable for the damages caused by his excessive and unprivileged use of force under the intentional tort of battery"); Restatement (Second) of Torts § 71 (1965) ("If the actor applies a force to or imposes a confinement upon another which is in excess of that which is privileged, . . . the actor is liable for only so much of the force or confinement as is excessive.") Further, an assault is "any act tending to do corporal injury to another, accompanied with such circumstances as to denote at the time an intention, coupled with the present ability, of using actual violence against the person." *Lewis v. Metro. Gen. Sessions Court for Nashville & Davidson County*, 949 S.W.2d 696, 703 (Tenn. Crim. App. 1997); *Dowlen v. Matthews*, No. M2001-03160-COA-R3-CV, 2003 WL 1129588, at *2 (Tenn. Ct. App. 2003). Tennessee courts have applied federal case law on claims for assault and battery in similar contexts, *see McCrary v. City of Memphis*, No. W2004-01840-COA-R3CV, 2005 WL 452788, at *6 (Tenn. Ct. App. 2005), and have held that, under Tennessee common law, "an officer may only use the force reasonably necessary to accomplish [an] arrest, with due regard to the other attendant circumstances, such as his own safety or that of others present." *City of Mason*, 581 S.W.2d at 626.

The court's analysis regarding the plaintiffs' § 1983 claim for excessive force applies with equal validity to his Tennessee law claims for assault and battery. As explained above, the

18

plaintiff has set forth adequate grounds for his claim of excessive force against each of the officers. Because Tennessee courts apply the same "excessive force" principles to assault and battery claims against police officers, the plaintiff has additionally set forth adequate grounds against each of the officers for assault and battery under Tennessee law.

Additionally, the court finds that the plaintiff's right to be free from assault and battery under Tennessee law was "clearly established" at the time of the incident. Tennessee courts have long held, as a "basic principle," that "an officer may only use the force reasonably necessary to accomplish the arrest." *City of Mason*, 581 S.W.2d at 626. In addition, it is established that "Tennessee courts may look to federal case law on excessive force in analyzing claims of assault and battery by police officers." *Murray ex rel Morrow v. Metropolitan Government of Nashville*, No. 3:06-0570, 2007 WL 1521004 at *9 (M.D. Tenn. 2007) (citing *Baker v. Snyder*, 2006 WL 2654163 at *6 (E.D. Tenn. 2006)). Accordingly, at the time of the incident, it was "clearly established" that an officer "may not use additional gratuitous force once a suspect has been neutralized." *Alkhateeb*, 190 Fed. Appx. at 452; *see also Phelps*, 286 F.3d at 301 (finding "no governmental interest in continuing to beat [the plaintiff] after he had been neutralized, [and] nor could a reasonable officer have thought there was"). In a case, such as this one, where a minor weighing approximately 90 pounds offered no credible signs of resistance, it was well established under Tennessee law that applying excessive force could result in a cause of action for assault and battery. Accordingly, the defendant officers are not entitled to qualified immunity as to this claim. The plaintiff's cause of action for assault and battery against each of the officers survives summary judgment.

### 2. False Arrest/Malicious Prosecution

19

The plaintiffs have brought one claim for False Arrest/Malicious Prosecution. It appears, however, that there are two distinct torts—one for false arrest and one for malicious prosecution. Accordingly, the court will analyze each tort in sequence.

### a. False Imprisonment

Under Tennessee law, "[f]alse imprisonment is the intentional restraint or detention of another without just cause." *Newsom v. Thalhimer Brothers, Inc.*, 901 S.W.2d 365, 367 (Tenn. App. 1994) (citing *Brown v. SCOA Indus., Inc.*, 741 S.W.2d 916, 919 (Tenn. App. 1987)). "The elements of the tort of false imprisonment are (1) the detention or restraint of one against his will and (2) the unlawfulness of the restraint." *Id.* (citing *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990)). Under the Tennessee Constitution, "a seizure implicating constitutional protections occurs only if, in view of all of the circumstances surrounding the encounter, a reasonable person would have believed that he or she was not free to leave." *Id.* (citing *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000)). The Tennessee courts have defined an "arrest" as "the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest." *State v. Crutcher*, 989 S.W.2d 295, 301 (Tenn. 1999) (quoting *West v. State*, 184 S.W.2d 602, 605 (Tenn. 1968)

Without a warrant or probable cause, such a restraint is illegal. *State v. Nicholson*, 188 S.W.3d 649, 656 ("Under both federal and state constitutions, a warrantless seizure is presumed unreasonable.); *see also State v. Berrios*, 235 S.W.3d 99, 104 (Tenn. 2007) (holding, in the exclusionary rule context, that "the general rule is that a warrantless search or seizure is

presumed unreasonable and any evidence discovered subject to suppression"). Accordingly, if

the plaintiffs have presented evidence indicating that Mr. Harris was "subject to the actual

control and will" of the defendant officers without probable cause of having committed a crime,

their claim for false arrest survives summary judgment. The plaintiffs have made such a

showing.

It does not defeat the plaintiffs' claim that Mr. Harris was merely handcuffed and

detained in a squad car for ten minutes, and not taken to an actual police station to be booked. In

fact, the Tennessee Supreme Court has held that "[a]n arrest may be affected without formal

words or a station house booking." *Crutcher*, 989 S.W.2d at 301. Instead, in order to constitute

an arrest, "there must be actual restraint on the arrestee's freedom of movement under legal

authority of the arresting officer." *Id*. In the case at hand, Mr. Harris was subjected to actual

restraint on his movement from the time that he was grabbed by Officer Valiquette until he was

finally released into the custody of his mother. During this time he was forced against a wall,

and then to the ground, handcuffed, and placed in a squad car. This series of events more than

meets Tennessee's definition of "arrest."[7] Each of the defendant officers participated in

---

[7]Defendants Metropolitan Government, Lt. Dupie, and Officer Valiquette, in their reply
memorandum, cite *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814-
15 (6th Cir. 1999), for the proposition that the "investigative stop" in the present case did not
ripen into an actual arrest. The *Houston* case is inapt for several reasons. First, the plaintiffs'
claim for false arrest has been brought under Tennessee law, and not under the Fourth
Amendment. It is Tennessee's definition of "arrest" that controls. *See State v. Berrios*, 235
S.W.3d at 105 ("This Court has previously held that our state constitution offers more protection
than the corresponding provisions of the Fourth Amendment.") Second, the *Houston* court relied
on a finding that the stop in question was "reasonably necessary to ensure the officers' safety"
inasmuch as the officers were, in that case, investigating a violent crime. *Id*. at 815. The
detention in the case at issue had no such justification. The hallmark of the Constitutional
transformation of *Terry* stops into arrests is that the "circumstances warrant [the] precaution."
*Id*. Even if the federal standard were to apply, under the facts at hand, the circumstances simply
did not warrant handcuffing or detaining Mr. Harris. Accordingly, under the reasoning of

21

restraining Mr. Harris.

It is not contended that the defendants had a warrant to arrest Mr. Harris; however, the defendants do allege that the phone call alerting them to a group of individuals gambling in the vicinity constituted "probable cause" for an arrest. Under Tennessee law, "[t]he question of probable cause is not exclusively a jury question;" rather, it is "a mixed question of law and fact." *Brown v. SCOA Industries, Inc.*, 741 S.W.2d 916, 918 (Tenn. App. 1987) (citing *Logan v. Kuhn's Big K Corp.*, 676 S.W.2d 948, 952 (Tenn. 1984). At the summary judgment stage, the court must take the facts in dispute in the light most favorable to the plaintiff in determining whether there is a factual dispute regarding probable cause. At the very least, there is such a dispute. Under Tennessee law, "to establish probable cause based on an informant's tip, there must be a showing of both the informant's credibility and his or her basis of knowledge." *State v. Gonzales*, 52 S.W.3d 90, 99 (Tenn. Crim. App. 2000) (citing *State v. Jacumin*, 778 S.w.2d 430, 436 (Tenn. 1989)). The defendants have made no such showing. Accordingly there is, at the very least, a factual dispute regarding the "probable cause" element.

Next the court must determine whether Mr. Harris's right against unlawful arrest was "clearly established" at the time of the incident. It was. The tort of false arrest is a longstanding

---

*Houston*, the detention in the case at hand would still be considered an arrest. Finally, as *Houston* makes clear, even *Terry* investigative stops require a finding of "reasonable suspicion" which is "more than an ill-defined hunch," and must be "based upon "a particularized and objective basis for suspecting the particular person . . . of criminal activity." *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). The officers in the case at hand had received a phone call indicating that African-American men in white t-shirts were gambling. It is far from uncommon for men of all races to wear white t-shirts in public and in private. Notwithstanding the generality of the description, there may have been a reasonable suspicion to briefly question Mr. Harris and his companions; however, after it was clearly observed that the men were not gambling, there was no reasonable suspicion for the officers to take further action against Mr. Harris.

cause of action in Tennessee. Detaining Mr. Harris on nothing more than a very generalized tip regarding gambling in the area should have been clearly understood as tortious by the defendant officers, based on the authority cited above. Likewise, viewed in the light most favorable to the plaintiffs, there was no evidence that Mr. Harris was "resisting a stop," and, therefore, it should have been clearly understood that restraining Mr. Harris's freedom of movement based on his "resistance" was a tortious act. It should have been very clear that forcing Mr. Harris into a wall and then onto the ground, handcuffing him, and detaining him in a squad car, without any demonstrable safety concern or any credible evidence that the Mr. Harris had been committing a crime was tortious. Accordingly, the defendant officers are not entitled to qualified immunity as to this claim. The unlawful arrest cause of action must survive summary judgment.

**b. Malicious Prosecution**

Under Tennessee law, "[t]o prevail on a malicious prosecution claim, the plaintiff must prove (1) that a prior suit or judicial proceeding was instituted without probable cause, (2) that the defendant brought the action with malice, and (3) that the action was finally terminated in the plaintiff's favor." *Majors v. Smith*, No. M2000-01430-COA-R30CV, 2001 WL 219656 at *2 (Tenn. App. 2001) (citing *Roberts v Federal Express Corp.*, 842 S.W.2d 246, 247 (Tenn. 1992). "A showing of a lack of probable cause will give rise to a rebuttable presumption of malice." *Smith v. Hartford Mutual Ins. Co.*, 751 S.W.2d 140, 143 (Tenn. App. 1987) (citing *Kerney v. Aetna Casualty and Surety Co.*, 648 S.W.2d 247 (Tenn. App. 1982).

In determining whether "a prior suit or judicial proceeding was instituted" the Tennessee courts have held that the "'prior judicial proceeding' need not be conducted in a 'court' in the strict technical and legal sense; but that certain administrative proceedings are at least 'quasi-

judicial' to the extent that they may be the basis for a malicious prosecution action, provided all the requisite elements of such an action are both alleged and proved." *Kauffman v. A.H. Robins Co.*, 448 S.W.2d 400, 522 (Tenn. 1969); *see also Lewis v. Allen*, 698 S.W.2d 58, 60 (Tenn. 1985) ("We interpret Kauffman as holding that any administrative tribunal or body duly established to conduct investigations or investigatory hearings and to make investigatory findings that may adversely affect legally protected interests of persons subject to its jurisdiction will satisfy the first element of a malicious prosecution action."). Accordingly it offers no defense for the officers in this case to point out that the citation was to a juvenile court, requiring Mr. Harris to meet with a police youth counselor.

Neither does it help the defendants that the citation was ultimately dismissed. In fact, this dismissal meets the third prong, requiring that "the action was finally terminated in the plaintiff's favor." *Roberts*, 842 S.W.2d at 247. *See Rogers v. Watts*, No. 01A01-9603-CV-00120, 1998 WL 34190567 at *6 (Tenn. App. 1998) ("Any dismissal indicating the innocence or nonliablity of the malicious prosecution plaintiff will suffice as a favorable termination.") (citing Restatement (Second) of Torts § 674 cmt. J (1997)).

For purposes of malicious prosecution, Tennessee courts have held that probable cause "is established where 'facts and circumstances [are] sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged." *Roberts*, 842 S.W.2d at 248 (citing *Logan v. Kuhn's Big K Corp.*, 676 S.W.2d 948, 951 (Tenn. 1984)). This is a standard that the vast majority of law enforcement personnel meet as they issue citations on a daily basis, some of which result in convictions, and some of which do not. However, viewing the evidence in the light most favorable to the plaintiffs, it is not a standard that was met in the case at hand.

The citation issued to Mr. Harris was for resisting arrest; however, as the plaintiffs have stated the facts, it was impossible for Mr. Harris to resist arrest at any point during the encounter. In fact, it seems plausible that Officer Valiquette issued the citation in order to justify the actions taken against Mr. Harris and his subsequent detention in the back of the squad car. If the jury were to find that the plaintiff did not resist arrest, it would follow that there was no probable cause for issuing the citation.

The plaintiffs' claim cannot, however, survive summary judgment against Lt. Dupie and Officer Hendry, inasmuch as they did not issue the citation. Officer Valiquette, as the officer who wrote the actual citation, is the only defendant against whom a valid claim has been supported.

Accordingly, the court must determine only whether Officer Valiquette may raise "official immunity" as to the malicious prosecution claim. The tort of malicious prosecution, like that of unlawful arrest and battery, is longstanding, and the liability of a police officer for issuing a citation for which there was no probable cause should have been clear to Officer Valiquette. A reasonable officer would have known that it is tortious to issue a citation against a juvenile for resisting arrest, when there was no probable cause that he was resisting arrest. There were no mitigating circumstances to offset this mistake. Issuing the citation was not a "split-second judgment," and Officer Valiquette was under no danger when he chose to issue it. Accordingly, Officer Valiquette is not entitled to "official immunity" for this cause of action. Defendants Lt. Dupie and Officer Hendry will be granted summary judgment as to the malicious prosecution cause of action; however, summary judgment will not be granted to Officer Valiquette.

### 3. Outrageous Conduct

Finally, the court will analyze the plaintiffs' claim for outrageous conduct. Under Tennessee law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). The Tennessee Supreme Court has identified the following "essential elements" for such a cause of action: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Id.*, citing *Medlin v. Allied Inv. Co.*, 217 Tenn. 469, 479 (1966); *see also Johnson v. Woman's Hospital*, 527 S.W.2d 133, 144 (Tenn. App. 1975).

The third element, that the conduct must "result in serious mental injury," requires evidence establishing that "the plaintiff's mental injury is serious or severe." *Miller v. Willbanks, M.D.*, 8 S.W.3d 607, 615 n. 4. That is, "[i]t is only where [the mental injury] is extreme that the liability arises." *Id.* (quoting Restatement (Second) of Torts § 46 cmt. J (1965)). In *Miller*, the Tennessee Supreme Court held that, for outrageous conduct claims, as opposed to claims for negligent infliction of emotional pain, "expert medical or scientific proof" is not required for a plaintiff to demonstrate "serious mental injury." *Id.* at 614. However, the court also made clear that the decision did "not change the definition of 'serious mental injury,'" and instead only recognized that "other forms of proof may also be used to establish" that requirement, including "a claimaint's own testimony . . . as well as the testimony of other lay witnesses acquainted with the claimant." *Id.* at 614, 615 (internal citations omitted); *see also*

26

*Fromuth v. Metropolitan Government of Nashville*, 158 F. Supp.2d 787, 796 (M.D. Tenn. 2001) ("Without anything more than his pleading of outrageous conduct as evidence of serious mental injury, Plaintiff cannot survive the Defendants' motions for summary judgment on his outrageous conduct claim.").

In the case at hand, the plaintiffs have offered absolutely no evidence that the conduct of the defendant officers caused Mr. Harris a severe mental injury. Mr. Harris has admitted that the only medical treatment he sought as a result of the accident was regarding his arm injury and that he has never seen a psychologist or psychiatrist as a result of the incident. Finally, in their response to the defendants' summary judgment motions, the plaintiffs completely failed to address the outrageous conduct claim or offer any evidence that could be construed in favor of a severe mental injury. Accordingly, there is no factual dispute as to this element, and the plaintiffs' outrageous conduct claim must be dismissed.

27

## CONCLUSION

For the reasons stated herein, the defendants' Motions for Summary Judgment will be granted in part and denied in part. The plaintiffs' *Monnell* claims against the Metropolitan Government of Nashville (Counts Two, Three and Four), the plaintiffs' negligence claim against the Metropolitan Government of Nashville (Count Five), the plaintiffs' outrageous conduct claim against the defendant police officers (Count Seven), and the claim for malicious prosecution as against Officer Hendry and Lt. Dupie will be dismissed. The remaining claims will move forward to trial.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

Case 3:06-cv-00868   Document 35   Filed 12/18/07   Page 28 of 28 PageID #: 286